UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

GLADYS MUHAMMAD aka
GLADYS WILSON                                                    **MEMORANDUM AND ORDER**
                                    Plaintiff,
                                                                04-cv-2294 (SLT) (MDG)

          -against-

NEW YORK CITY TRANSIT AUTHORITY,

                                    Defendant.
------------------------------------------------------------x

**TOWNES, United States District Judge,**

Plaintiff Gladys Muhammad alleges that the New York City Transit Authority

discriminated against her, a Transit Authority bus driver, on account of her religion by

transferring her to a bus depot after she refused to remove or cover her khimar – a headscarf

worn by some Muslim women.  As relevant here, the amended complaint alleges violations of

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq*. and the First

Amendment of the U.S. Constitution.  The Transit Authority now moves for summary judgment.

For the reasons set forth below, the Transit Authority's motion is denied.

**Legal Standard**

Summary judgment is appropriate only where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(c).  The role of the court is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v.*

*Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is

sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477

U.S. at 252.  In determining whether there is a genuine issue of material fact, a court resolves all ambiguities and draws all justifiable inferences in favor of the non-moving party.  *Id*. at 255.

The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, 101 (2d Cir. 2010).

With that standard in mind, the pertinent facts, undisputed, or where disputed considered in Plaintiff's favor, are as follows:[1]

## Background

### *Factual Background*

The Transit Authority is the country's largest mass transit agency, employing about 45,000 people, including approximately 10,000 bus operators and 3,000 train operators.  *United States v. New York City Transit Auth.*, 04-CV-4237, 2010 WL 3855191, at *1 (E.D.N.Y. Sept. 28, 2010); Def.'s 56.1 Stmt. at ¶ 14.

Muhammad, a Muslim woman, was hired as a bus driver by the Transit Authority in November 2001.  (Def.'s 56.1 Stmt ¶ 2; Pl.'s 56.1 Stmt. ¶ 2.)  She wore a khimar to work every

_____

[1] Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York requires a party seeking summary judgment to submit a statement "of the material facts as to which the moving party contends there is no genuine issue to be tried." *See also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  The facts recited herein are drawn primarily from these statements – so-called 56.1 statements – and attached documents.  Furthermore, Muhammad "incorporates by reference" the 56.1 Restatements of Fact submitted by the Department of Justice and Stephanie Lewis in companion cases to this action. *Lewis v. New York City Transit Auth.*, Dkt. No. 04-cv-2331 (SLT) (Docket Entry No. 170); *United States v. New York City Transit Auth.*, Dkt. No. 04-cv-4237 (SLT) (Docket Entry No. 191).  Where there is no dispute with the facts alleged in the instant action, the Court will rely on facts alleged in the companion 56.1 statements. *See McGarr v. City of Peekskill*, 975 F. Supp. 2d 377, 379 (S.D.N.Y. 2013) (relying on "incorporated" 56.1 Statements submitted in related case).

day, without incident, until July 2002. (Pl's 56.1 Stmt. at ¶ 3; Compl. ¶ 14.) In July 2002, she

was told by the general manager of the East New York Depot where she was assigned that she

either had to remove her khimar or wear a Transit Authority issued baseball cap on top of her

khimar. (*Id.* at 18.) When she refused to remove or cover her khimar – citing a religious

objection – a meeting between Muhammad, her union representative, and Transit Authority

officials was called. After the meeting, she was permitted to continue operating a bus out of the

East New York Depot. At some point, she was transferred to the 126th Street Depot, where she

continued operating a bus without incident until November 2003.

The Transit Authority promulgated a "Temporary Bulletin," the periodic uniform

guidelines published by the Transit Authority, dated September 13, 2002 and slated to expire on

May 1, 2003, which provided, in relevant part:

> **Depot logo caps are optional.** Depot caps may only be worn with the bill of the
> cap facing forward.

(Pl.'s Ex. C-1) (bolding in original). The Bulletin made no mention of religious headwear. The

Transit Authority issued another Temporary Bulletin, dated April 28, 2003, which states, in part:

> **Uniform hats/Depot logo caps**. If an operator elects to wear any form of
> headwear, NYCT issued uniform hats, such as the depot logo caps, shall be worn
> (with the bill of the cap facing forward).

(Pl.'s Ex. C-2) (bolding in original).

In early November 2003, after Muhammad received a violation for failing to comply with

the Transit Authority's uniform policies, she was again taken off of her bus route for refusing to

remove her khimar or cover it with a Transit Authority baseball cap. (Compl. at ¶¶ 25-28;

Muhammad 12/11/13 Decl. ¶ 10). She explained to her supervisor that her religious beliefs did

not permit her to remove or cover her khimar. General Superintendent Cordell Rogers

demanded that Muhammad prove the sincerity of her religious beliefs. (Compl. at ¶¶ 25-29.)

Muhammad provided a letter, dated November 9, 2003, from Minister Kevin Muhammad, the minister of Nation of Islam's Muhammad Mosque No. 7, which explained that as an active member of the mosque, Muhammad is required to wear "a modest head covering."  (*Id*. at ¶ 30 and Ex. B.)

Following her meeting with Rogers, Muhammad was taken out of "passenger service" – that is, any position in which she might interact with the Transit Authority's customers – and instead assigned to cleaning buses in the 126th Street Depot.  The Transit Authority admits that after Muhammad "expressed unwillingness to comply with the headwear portion of the uniform policy," it "reassign[ed] her, [without changing her] title, to a non-passenger service bus operator assignment – one created for her by taking away overtime from more senior bus operators – as a 'shifter' in her depot."  (Def.'s 56.1 Stmt at ¶ 5.)  Before she could begin as a "shifter," Muhammad had to be retrained, and in the interim, she was assigned to cleaning buses.  (*Id*. at ¶ 6.)  The Transit Authority contends that it "was doing [Muhammad] a favor in giving her paid work during a period in which she could not yet be assigned to actual shifting work (due to her failure [to be retrained].)"  (Def.'s 56.1 Stmt. at ¶ 8.)

For the following two weeks, Muhammad reported to work but did not receive any assignments, other than miscellaneous janitorial tasks.  After complaining to her union, Muhammad spent two weeks in late November and early December performing work for the union while her grievance was investigated.  When she returned to the 126th Street Depot in mid-December, she was again assigned cleaning duties, although she had received "shifter" training on December 1, 2003.  (Compl. ¶¶ 39-40; Def.'s 56.1 Stmt. at ¶ 6).

On November 17, 2003, after Muhammad was taken out of passenger service, the Transit Authority issued an updated "Permanent Bulletin" applicable to bus drivers.  This is the earliest

document submitted to the Court by the parties that expressly discusses religious headwear. The detailed uniform policy directs managers to strictly enforce the Transit Authority's headwear policies and to command any employee who refuses to remove or cover his or her non-compliant headwear with a "depot logo cap" for religious reasons to "immediately visit the Depot AGM[] to discuss the matter." (Pl.'s Ex. C-3 at 2.)

A month after completing "shifting" training, on December 31, 2003, Muhammad was officially involuntarily transferred to "shifting" duty – that is, moving empty buses back and forth within the bus depot and between depots. (Compl. Ex. D.) Muhammad declares that "[s]hifting is not desirable work due to the strenuous nature of the work and the noxious fumes which accumulate in the bus yard." (Muhammad 12/11/13 Decl. ¶ 17.) She testified at her deposition that she was required to fuel the buses using a heavy metal hose that hurt her shoulders and wrists to operate. (Muhammad Dep. 8:20-9:2.) This transfer also caused Muhammad to be stigmatized by her colleagues, because she was involuntarily assigned to a highly-coveted shift, one that included regular Saturdays and Sundays off. Typically, more senior Transit Authority employees are entitled to exercise their seniority to secure their desired shifts. As a result of being assigned a shift with weekends off "she became the object of scorn and ridicule from more experienced employees" who were angry that Muhammad had been assigned to the "most coveted" days off. (Compl. at ¶¶ 42-44.) Employees with less seniority than Muhammad were permitted to select their shifts in light of their seniority, but Muhammad was not. (*Id*. at ¶¶ 44-45.) Muhammad had no control over her schedule and "absolutely no contact with [Transit Authority] customers since late November of 2003." (*Id*. at ¶ 46.) Muhammad continued to work as a "shifter" in the 126th Street Depot until the fall of 2005, when the Transit Authority terminated her employment. (Def.'s 56.1 Stmt. at 13.)

Muhammad filed a charge of discrimination with the EEOC, which was signed on October 24, 2003 and received by the EEOC on December 10, 2003, and which provides:

> Complainant is of the Islamic faith.  Her religious beliefs require her to cover her head with a Khimar (obligatory headdress).  Nothing is to be worn over the khimar.
>
> Complainant commenced employment with the NYC Transit Authority as a bus operator in November 2001.  Complainant was informed that religious headdress was permissible.
>
> Complainant is now being harassed for wearing a Khimar while driving NYCTA busses.  Complainant has been told to remove her Khimar, threatened with denial of bus routes, ridiculed with regards to her hair and told to cover her Khimar.
>
> Male Muslim bus operators are permitted to drive NYCTA busses while wearing religious headdress (Fez/Kufi),

 (Def.'s 56.1 Stmt. Ex. 8.)  The EEOC issued a Right to Sue letter on March 4, 2004.

Muhammad commenced the instant action on June 3, 2004.  In her amended complaint, filed June 21, 2004, she alleges religious discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq*.) ("Title VII"), New York City Human Rights Law, N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"),[2] and the First Amendment of the U.S. Constitution.  She also alleged Title VII hostile work environment, Title VII race discrimination, and state constitutional claims, which were dismissed by this Court's September 22, 2006 order on defendant's motion to dismiss, (Dkt. No. 70), and gender and race discrimination claims,

---

[2] Defendant has not moved for summary judgment on plaintiff's NYCHRL religious discrimination claim.  In any event, because, as explained *infra*, plaintiff's Title VII claims survive summary judgment under Title VII, her NYCHRL claims would too.  *Zann Kwan*, 737 F.3d at 843 n.3 ("[T]o the extent that the defendant has failed to show it is entitled to summary judgment under *McDonnell Douglas*[ on its Title VII claims], it would not be entitled to summary judgment under the more expansive standard of the NYCHRL."); *Adams v. City of New York*, 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011) (finding no need to separately analyze NYCHRL claims, other than those "claims that failed to pass under the Title VII … standards" because claims that satisfied federal standards will necessarily satisfy the less exacting NYCHRL standards).

which she has agreed to voluntarily withdraw, (Pl.'s Br. at 2). A number of other Muslim

women, a Sikh man, and the DOJ have also brought suits in this Court challenging the Transit

Authority's policies on religious headwear. *See Small and Alkebulan v. New York City Transit*

*Auth.*, Dkt. No. 03–cv–2139 (SLT); *Lewis v. New York City Transit Auth.*, Dkt. No. 04-cv-2331

(SLT); *United States v. New York City Transit Auth.*, Dkt. No. 04-cv-4237 (SLT); *Harrington v.*

*Reuter*, Dkt. No. 05–CV–3341 (SLT).

The Transit Authority now moves for summary judgment. As the parties are no doubt

aware, this Court recently denied the Transit Authority's motion for summary judgment in one of

these companion cases – *Lewis v. New York City Transit Auth*., 04-CV-2331 SLT MDG, 2014

WL 1343248, --- F. Supp. 2d --- (E.D.N.Y. Mar. 31, 2014). The Court assumes the parties'

familiarity with that decision. In this motion, the Transit Authority raises many of the same

arguments that this Court rejected in *Lewis*. For the following reasons, and for the reasons stated

in this Court's opinion in *Lewis*, the Transit Authority's motion is denied in its entirety.

## Discussion

### A. Muhammad's Title VII Claims are Adequately Exhausted

The Transit Authority contends that Muhammad did not properly exhaust her

administrative remedies prior to commencing the instant proceeding. "Exhaustion of

administrative remedies through the EEOC is an essential element of the Title VII … statutory

scheme[] and, as such, a precondition to bringing [a Title VII claim] in federal court." *Legnani*

*v. Alitalia Linee Aeree Italiane*, *S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001) (per curiam). A district

court may only review Title VII claims that were either contained in the EEOC charge or are

reasonably related to claims in the charge. *Id.* at 686. "Each incident of discrimination and each

retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment

practice,'" and "each discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

First, the Transit Authority contends that all of Muhammad's claims of religious discrimination "postdate" her charge of discrimination because her charge, stamped "Received" by the EEOC on December 10, 2003, was signed by Muhammad and notarized over a month earlier – on October 24, 2003 – before she was transferred to the bus depot. (Def.'s Br. at 8, 17.) There is no evidence in the record of what day the charge was submitted to the EEOC, nor is there any explanation for the one-and-a-half month gap between when it was notarized and received. During that month, in early November 2003, Muhammad was reprimanded for not complying with the Transit Authority's uniform policies and was taken off of her bus route for refusing to remove or cover her khimar. (Compl. at ¶¶ 25-28; Muhammad 12/11/13 Decl. ¶ 10). By December 10, 2003 – the date that the EEOC marked Muhammad's charge of discrimination as "Received" – the Transit Authority committed the allegedly discriminatory act that is the subject of this lawsuit, (*i.e.*, involuntarily transferring Muhammad to a fume-filled bus depot and assigning her janitorial tasks for refusing to remove or cover her khimar). Thus, if the operative date of the EEOC charge is – as the Transit Authority argues – the date that Muhammad signed the EEOC form, then the November 2003 involuntary transfer to the bus depot postdates the charge. If the operative date of the charge is the date it was marked "Received" by the EEOC, then the Transit Authority's allegedly discriminatory acts predate the charge.

The statute does not define when an EEOC charge should be deemed "filed." 42 U.S.C.A. § 2000e-5(b). However, cases construing the administrative exhaustion requirement suggest that the relevant date for "filing" an EEOC charge is the date that the complainant *communicated* her request for remedial action to the EEOC. *See Broich v. Inc. Vill. of*

*Southampton*, CV-080553 SJF ARL, 2011 WL 284484, at *6-7 (E.D.N.Y. Jan. 25, 2011), *aff'd in part, vacated in part on other grounds*, 462 F. App'x 39 (2d Cir. 2012) (finding an EEOC Intake Questionnaire did not constitute a charge because it did not communicate a request that the EEOC "activate its enforcement machinery" (citations omitted)). This is because the "primary purpose" of filing a charge of discrimination with the EEOC "is to alert the EEOC to the discrimination that a plaintiff claims she is suffering" in order "'to give the administrative agency the opportunity to investigate, mediate, and take remedial action.'" *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401-02 (2d Cir. 1993) (citing *Stewart v. I.N.S.*, 762 F.2d 193, 198 (2d Cir. 1985)). Thus, a charge cannot be "filed," within the meaning of 42 U.S.C.A. § 2000e-5(b), before the complainant alerts the EEOC that it should "activate its machinery and remedial processes." *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) (explaining, in the ADEA context, that an EEOC charge of discrimination is "a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee.").

Muhammad did not communicate with the EEOC when she placed her notarized signature on the charge of discrimination. She did so when she submitted the signed charge to the EEOC. Under the circumstances here, that date is deemed to be the date that the charge of discrimination was stamped 'Received' by the EEOC. Accordingly, Muhammad's charge properly encompasses discriminatory acts that took place in the 300 days preceding December 10, 2003 – including the November 2003 transfer to the bus depot.

Second, the Transit Authority argues that some of Muhammad's religious discrimination claims – specifically, her failure to accommodate and disparate impact claims – are unexhausted because they were not expressly included in the EEOC charge. (Def.'s Br. at 10, 19.) Failure to

file a timely administrative charge with the EEOC generally extinguishes a claim and prohibits recovery, unless one of three exceptions to the exhaustion requirement articulated by the Second Circuit in *Butts* is applicable. 990 F.2d at 1401. Here, the first exception, for unexhausted claims that are "reasonably related" to claims included in the charge, applies. *Id.* A claim is reasonably related "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001) (internal quotation marks omitted). "In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (citing *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 637 (9th Cir. 2002)). "The central question is whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (internal citations and quotation marks omitted).

In *Jenkins v. New York City Transit Authority*, the Transit Authority raised this same argument – that disparate impact claims were unexhausted because they were not expressly articulated in the EEOC charge – in response to a suit by a Pentecostal bus driver alleging that the Transit Authority's uniform policy prohibiting skirts disparately impacted members of the plaintiff's religion. 646 F. Supp. 2d 464 (S.D.N.Y. 2009). The Southern District of New York explained that plaintiff's EEOC charge, which identified "religion" as the cause of discrimination and stated that "that the Transit Authority enforced a uniform policy requiring bus operators to wear pants, that her religious beliefs as a Pentecostal did not permit her to wear pants, and that she was terminated because she refused to comply with the uniform policy,"

sufficiently exhausted plaintiff's disparate impact claims because "[i]t would be reasonable to expect that an investigation arising out of these allegations would inquire into whether such a policy has a disparate impact on members of the plaintiff's religion." *Id*. at 470. The court explained that "[e]ven though the plaintiff may not have used the term 'disparate impact' in her charge, '[i]t is the substance of the charge and not its label that controls.'" *Id*. at 470-71 (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 2008) (*Deravin*, 335 F.3d at 201)).

Here, in Muhammad's EEOC charge, she stated that she is "a bus operator" "of the Islamic faith," and required by her "religious beliefs … to cover her head with a Khimar." (Def.'s 56.1 Stmt. Ex. 8). She stated that she was "being harassed [by her employer] for wearing a Khimar while driving NYCTA busses," was "told to remove [and cover] her Khimar," and was "threatened with denial of bus routes." (*Id*.) A reasonable investigation into these allegations would have immediately uncovered that the Transit Authority followed through with the complained-of threats and denied Muhammad a bus route. Additionally, as in *Jenkins*, these facts put the EEOC investigator on notice to investigate whether any religious discrimination wrought by the Transit Authority's headwear policy disparately impacted other members of plaintiff's faith. Accordingly, Muhammad's disparate impact and failure to accommodate claims were properly exhausted, as they are reasonably related to her allegations of religious discrimination.

## B. Title VII

Title VII prohibits employment discrimination on the basis of, *inter alia*, religion. Specifically, an employer may not "fail or refuse to hire or ... discharge any individual, or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion," 42 U.S.C.

§ 2000e-2(a)(1), or "limit, segregate or classify" an employee in a way that would "adversely affect his status as an employee," because of that employee's "religion." 42 U.S.C. § 2000e–2(a)(2), § 703(a)(2). It "prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). It also affirmatively requires employers to "make reasonable accommodations, short of undue hardship, for the religious practices of … employees and prospective employees." *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (citing *Trans World Airlines. Inc. v. Hardison*, 432 U.S. 63, 74 (1977)); *see also Weber v. City of New York*, 11-CV-5083 MKB, 2013 WL 5416868, at *12 (E.D.N.Y. Sept. 29, 2013) (observing that a plaintiff alleging religious discrimination in violation of Title VII may simultaneously proceed under a theory of disparate treatment and denial of reasonable accommodations); *Ramprasad v. NYC Health & Hosp. Corp.*, CV 98-1506 (RJD), 1999 WL 294787, at *2 (E.D.N.Y. Mar. 5, 1999) (recognizing "two conceptually distinct religious discrimination theories under Title VII: 'failure to accommodate' cases and 'pretext' cases").

1. ***Muhammad's Title VII Religious Discrimination Claim under a Failure to Accommodate Theory***

The Transit Authority argues that Muhammad's claims based on the Transit Authority's failure to accommodate her religious beliefs are not adequately pleaded as required by Rule 8(a) of the Federal Rules of Civil Procedure. (Def.'s Br. at 9.) However, under the pleading standard set forth in Rule 8(a)(2), complaints must merely include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, "a plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.*, 445 F.3d 586, 591 (2d Cir. 2006). In order to plead a

religious discrimination claim under failure to accommodate theory, a plaintiff must specifically plead that she informed her employer of a conflict between her religious beliefs and a job requirement. *See Ramprasad*, 1999 WL 294787, at *3 (citing *Philbrook v. Ansonia*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd and remanded*, 479 U.S. 60 (1986)).

Here, Muhammad's amended complaint clearly passes muster. It states that Muhammad, a Transit Authority bus driver, (Amd. Compl. ¶ 3), and practicing Muslim since 1993, (*id*. at ¶ 6), wore a khimar since beginning her employment without incident until July 2002, when the Transit Authority threatened to take her off of her bus route unless she removed or covered her khimar, (*id*. at ¶¶ 10-23). She further alleges that in November 2003, she was again told to remove or cover her khimar, and when she refused, citing her religious objection, was transferred to a fume-filled bus depot where she was assigned janitorial work, no longer permitted to interact with passengers, and harassed by coworkers. (*Id*. at ¶¶ 24-48). Muhammad expressly pleads that when asked by a senior Transit Authority supervisor to comply with the Transit Authority's headwear policy, she "refused to remove her khimar or to wear a baseball hat over her khimar citing her Muslim beliefs" and "provide[d] a letter stating that she was in fact a Muslim in good standing" from "Minister Kevin Muhammad … of Mosque No. 7." (*Id*. at ¶¶ 27-30.) Muhammad's complaint unambiguously put the Transit Authority on notice of her claim that her religious beliefs, of which the Transit Authority was aware, were not reasonably accommodated. Accordingly, the Transit Authority's motion for summary judgment on Rule 8 grounds is denied.

### 2. *Muhammad Sets out a Prima Facie Case of Title VII Religious Discrimination.*

The Transit Authority argues that Muhammad has not made out a *prima facie* case of Title VII religious discrimination under theories of failure to accommodate, disparate treatment, or disparate impact.

### i. *Failure to Accommodate Claim*

In order to make out a *prima facie* case of religious discrimination on a failure to accommodate theory, a plaintiff must prove that: "(1) he or she has a *bona fide* religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Philbrook*, 757 F.2d at 481 (citations omitted).

### 1. *Muhammad's Bona Fide Religious Beliefs*

The Transit Authority contends that Muhammad has not made out a *prima facie* case of religious discrimination because she does not have a "bona fide (*i.e.*, sincerely held) *religious* belief." (Def.'s Br. at 10-12 (emphasis in original).) First, the Transit Authority asks this Court to conclude, from Muhammad's testimony that she would wear a winter hat over her khimar in cold weather, that Muhammad was "without apparent theological constraint" and thus lacked a sincerely held religious belief that prevented her from complying with the Transit Authority's uniform policy. (Def.'s Br. at 11.) Second, the Transit Authority apparently disagrees with Muhammad and her Minister's interpretation of the Quran, arguing that Muhammad should have simply removed her headscarf because, "generally speaking. … some Muslim women do, and some do not [wear headscarves]." (Schoolman Decl. ¶ 6(a).) The Transit Authority explains that "in recent years, [the Transit Authority's attorney] ha[s] conducted a good deal of research into the question of the use, or non-use, of the headscarf … by Muslim women when in public" and asks this Court to take judicial notice that in the streets of "Cairo (Egypt), Casablanca (Morocco), and Istanbul (Turkey) – all cities with overwhelming Muslim populations – a passerby could confirm" that some Muslim women do not wear headscarves. (Schoolman Decl. ¶ 6(a).) Finally, the Transit Authority contends that Muhammad could not have had a sincere

religious objection to covering her khimar with a depot cap because some Muslim women wear caps or insignia over their khimars. In support, the Transit Authority has submitted two photographs taken from the internet of Muslim women. One depicts a rally of Hezbollah supporters in Lebanon, including some women with caps over their headscarves, that is captioned "Hundreds of thousands of people packed a square in the suburbs of Beirut to listen to Hezbollah's leader, Hassan Nasrallah, declare a 'divine victory' in the recent war with Israel." (Schoolman Decl. Ex. 18.) The second image is of two unidentified women in headscarves with berets on top bearing an insignia, which the Transit Authority contends is an image of Muslim female police officers in the "Palestinian Authority." (*Id.*)

In response, Muhammad explains that she has been a Muslim – and worn a khimar – for over twenty years and believes "that wearing a khimar is required by [her] religion and that as a sacred garment [she] must not desecrate [her] khimar [with either a hat or corporate logo]." (Muhammad 12/11/13 Decl. ¶¶ 2-6.) When Muhammad first refused to remove or cover her khimar citing a religious objection, her supervisor demanded that she provide documentation to prove the sincerity of her beliefs. Muhammad promptly produced a letter from the leader of her mosque, which states that Muhammad is "an active member in good standing at Muhammad Mosque No. 7" and explains that wearing "a modest head covering" is dictated by Chapter 24, Verse 31 of the Quran, which (according to the letter), provides: "let them wear their head coverings over their bosoms." (Compl. Ex. B.)

Even assuming that Transit Authority's "evidence" on the sincerity of Muhammad's religious beliefs is sufficient to create a question of fact, it is a question for the jury to decide.[3] Although "it is entirely appropriate, indeed necessary, for a court to engage in analysis of the sincerity—as opposed, of course, to the verity—of someone's religious beliefs in … the Title VII context," the inquiry must focus on whether a plaintiff is "fraudulently hiding secular interests behind a veil of religious doctrine," and not on "the factfinder's own idea of what a religion should resemble." *Philbrook*, 757 F.2d at 481-82 (internal quotation marks and citations omitted). By repeatedly asserting that, because some Muslim women remove or cover their headscarves, Muhammad must as well, the Transit Authority is, in effect, arguing that all Muslim women subscribe to the same interpretations of Islam as those pictured in its exhibits. On this record, Muhammad has adequately demonstrated that her sincerely held religious beliefs prevent her from removing or covering her khimar and this Court cannot "make a finding of insincerity without a full exposition of facts" before a fact finder. *Id*. at 482 (quotations marks and citation omitted). The Transit Authority's only evidence on this point that is specific to Muhammad is that she testified to wearing hats over her khimar in the winter. Based on this fact, alone, this Court cannot find, as a matter of law, that Muhammad is "fraudulently hiding secular interests behind a veil of religious doctrine." *Id*. Accordingly, the Transit Authority's motion for summary judgment on these grounds is denied.

---

[3] This Court cannot take judicial notice of the fashion choices of the women on the streets of Cairo, Casablanca, and Istanbul. *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 361 (E.D.N.Y. 2013) (declining to take judicial notice of facts asserted in an affidavit because "Federal Rule of Evidence 201[b] provides that courts may only take judicial notice of facts outside the trial record that are 'generally known within the trial court's territorial jurisdiction' or 'not subject to a reasonable dispute.'" The photographs do not appear to be admissible, as the accompanying affidavit does not attempt authenticate them. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("The principles governing admissibility of evidence do not change on a motion for summary judgment. … Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

### 2. Muhammad has Presented Sufficient Evidence From Which a Reasonable Jury Could Find that Muhammad was Disciplined for Refusing, on Religious Grounds, to Comply with the Transit Authority's Conflicting Headwear Policy

The Transit Authority next argues that Muhammad cannot make out a *prima facie* case of religious discrimination in violation of Title VII under a failure to accommodate theory because she was not disciplined for refusing to comply with the Transit Authority's uniform policies; rather, "by conscious choice [Transit Authority] management chose *not* to discipline her for violating that policy (when it would have disciplined a colleague for comparable categorical non-compliance for secular reasons)." (Def.'s Br. at 11-12.) Muhammad responds that the transfer to the bus depot did, in fact, constitute discipline within the meaning of a failure to accommodate claim.

The Transit Authority made these same arguments in its motion for summary judgment in *Lewis*. As in *Lewis*, under the facts of this case, it is a question of fact whether the transfer constitutes discipline. The parties are directed to this Court's decision in *Lewis* for a more in-depth analysis. In brief, while "[t]he Second Circuit has never defined 'discipline' within the context of the three-pronged religious discrimination test," *Siddiqi v. N.Y. City Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008) (citations omitted), the third prong of a failure-to-accommodate claim "has been equated with the requirement of an adverse employment action" in the discrimination context. *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 695 (S.D.N.Y. 2011); *see also St. Juste v. Metro Plus Health Plan*, 10-CV-4729 MKB, 2014 WL 1266306 (E.D.N.Y. Mar. 28, 2014) (collecting cases.) The Second Circuit has held that an internal transfer can constitute an adverse employment action if "accompanied by a negative change in the terms and conditions of employment," *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003) (internal citations omitted), or "if it results in a change in responsibilities so

significant as to constitute a setback to the plaintiff's career," *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 641, (2d Cir. 2000).

Here, the transfer was involuntary. The bus depot, where Muhammad was assigned to duties of washing, refueling, and shifting buses, was filled with fumes. Unlike other drivers at the depot, she was not permitted to use her seniority to pick her desired shifts, and concomitantly, lost access to shifts with overtime opportunities. Instead, she was involuntarily assigned a coveted shift that made her the object of senior colleagues' contempt and scorn. Under these circumstances, it is a question for the jury whether the transfer constituted 'discipline,' within the context of a religious discrimination claim. *See Lewis*, 04-CV-2331 SLT MDG, 2014 WL 1343248 at *13 (collecting cases and finding that involuntarily transferring a Muslim bus driver to the bus depot for refusing to remove or cover her khimar may constitute an adverse employment action); *see also Lore v. City of Syracuse*, 670 F.3d 127, 170-01 (2d Cir. 2012) (finding that jury should decide whether series of transfers without change to salary or rank – from a position as public information officer where plaintiff dealt with media and was spokesperson for police department to a variety of positions that she testified were less desirable – were adverse employment actions). Thus, because Muhammad has made out a *prima facie* failure to accommodate case by showing that her sincerely held religious beliefs, of which the Transit Authority was fully-aware, conflicted with a Transit Authority headwear policy and that she was disciplined for refusing to comply with that policy, the Transit Authority's motion for summary judgment on these grounds is denied.[4]

---

[4] The Transit Authority's argument that it would have disciplined a hypothetical colleague for comparable conduct misses the point. Had Muhammad cited a secular objection to the headwear policy, she could have simply removed the offending headwear and gone on driving her bus. The November 17, 2003 Transit Authority Bulletin expressly provided that "if [an] employee is wearing any form of headwear" other than Transit Authority cap, his supervisor

### 3. A Rational Factfinder Could Conclude that the Transit Authority Did Not Offer Muhammad a Reasonable Accommodation for Her Religious Beliefs

Once a *prima facie* case is established by the employee, the employer "must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" *Baker*, 445 F.3d at 546 (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002) (alterations in original, italics added)). A reasonable accommodation is one that eliminates the conflict between the employee's religious practice and the employer's policy. *Cosme*, 287 F.3d at 159. The Transit Authority contends that it did just that when it transferred Muhammad to the bus depot. (Def.'s Br. at 12-16) (In transferring Muhammad, "the [Transit Authority] offered, and plaintiff accepted, what the law considers to be a reasonable accommodation to what the [Transit Authority] will treat as her 'religious' practice of not wishing to wear a [Transit Authority]-issued cap over her khimar…."). As it did in *Lewis*, the Transit Authority argues that it satisfied its obligation to accommodate Muhammad's religious practices when it transferred her to the bus depot, relying on *Ansonia Bd. of Educ. v. Philbrook*, in which the Supreme Court explained that, once an employer has "reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." 479 U.S. 60, 68 (1986); *see also Cosme*, 287 F.3d at 158 (An "employer need not offer the accommodation the employee prefers."); *Baker*, 445 F.3d at 548 ("We do note that employees are not entitled to hold out for the most beneficial accommodation." (citation and internal quotations omitted)).

---

must "inform the employee to remove the headwear" and "if the employee removes the non-[Transit Authority] issue headwear, no further action in necessary." (Pl.'s Ex. C-3.) There is no helpful comparison to be drawn between Muhammad, on one hand, and a hypothetical employee who refuses to remove offending headwear for non-religious reasons when asked by his supervisor, on the other. That hypothetical employee would not just be violating the uniform policy – he would be insolent in the face of his supervisor's reasonable request.

However, as this Court explained in *Lewis*, an employer's duty is not satisfied unless the accommodation is *reasonable*.  *Lewis*, 2014 WL 1343248, at *16-17.  In brief, an accommodation is not reasonable "'if it cause[s] [an employee] to suffer an inexplicable diminution in his employee status or benefits....  In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification....'" *Baker*, 445 F.3d at 548 (citing *Cosme*, 287 F.3d at 160) (alterations and emphasis in original).  As this Court previously observed in another related case involving this same Transit Authority policy:

> The determination of "[w]hether or not something constitutes a reasonable accommodation is necessarily fact-specific." *Wernick v. Fed. Reserve Bank*, 91 F.3d 379, 385 (2d Cir. 1996). It typically requires a cost-benefit analysis: an evaluation of "the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski v. Valley Cent. School Dist.*, 63 F.3d 131, 138 (2d Cir. 1995). "[D]eterminations on this issue must be made on a case-by-case basis, *Wernick*, 91 F.3d at 385, and "[o]rdinarily, questions of reasonableness are best left to the fact finder." *Baker*, 445 F.3d at 548 (quoting *EEOC v. Universal Mfg. Corp*., 914 F.2d 71, 73 (5th Cir. 1990)).

*United States v. New York City Transit Auth.*, 2010 WL 3855191, at *17-19.  Muhammad has adduced proof which, if credited, would establish that she experienced a significant diminution of status and benefits when she was transferred to the bus depot.  Although the Transit Authority asserts that the transfer was not a burden, this is an open question of fact for the jury.  Accordingly, a genuine issue of fact remains whether the Transit Authority failed to accommodate Muhammad's religious beliefs, as required by Title VII.

### ii.  *Intentional Discrimination*

The Transit Authority asserts, without citation, that Muhammad cannot make out a *prima facie* case of intentional religious discrimination and cannot show that the Transit Authority's

proffered explanation for its actions, (that the Transit Authority "was trying to maintain a uniform uniform policy") was not pretextual. (Def.'s Br. at 17.)

Muhammad has made out a *prima facia* case of intentional religious discrimination. Under *McDonnell Douglas*, to make out a *prima facie* discrimination case, plaintiff must demonstrate that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). The plaintiff's burden of proof at the *prima facie* stage "is not onerous," *Burdine*, 450 U.S. at 253, because "[c]ourts recognize that most discrimination and retaliation is not carried out so openly as to provide direct proof of it," *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). Here, as discussed above, Muhammad has adequately demonstrated, for the purposes of making out a *prima facie case*, that (1) she was a member of a protected class, namely, a Muslim; (2) she was otherwise qualified to be a bus driver, a position she held without incident before the Transit Authority started to enforce its no-headwear policy; and (3) that she was subject to an adverse employment action when she was transferred to the bus depot. Although the Transit Authority asserts that Muhammad cannot demonstrate the fourth prong – that the circumstances give rise to an inference of discrimination – Muhammad has adduced enough evidence from which a reasonable factfinder could conclude that the involuntary transfer was motivated by discriminatory animus. A jury could infer discriminatory animus from the undisputed fact that the Transit Authority transferred Muhammad, who was otherwise qualified to work in passenger service, to the bus depot, where she faced allegedly deplorable conditions and was hidden from public view, solely on the basis

of her religious beliefs. Accordingly, Muhammad has made out a *prima facie* case of intentional religious discrimination.

Once a *prima facie* case has been shown, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff "to show that [the defendant's] stated reason for [the adverse employment action] was in fact pretext." *Id*. at 804. In a single-sentence attempt to meet its burden, the Transit Authority contends that is had "a legitimate and non-religious-based reason for what it did: seeking to maintain, as it had a right to do as an employer, its uniform policy for passenger-serve bus operators (while keeping Ms. Muhammad productively employed as a bus operator)." (Def.'s Br. at 18.) Even assuming the Transit Authority's goal of homogeneity is sufficient to shift the burden back onto Muhammad to show that the Transit Authority's stated reason was in fact pretext for discrimination, Muhammad has met her burden. Evidence in the record establishes that the Transit Authority did not uniformly enforce its uniform policy. For example, after the September 11, 2001 terrorist attacks, bus drivers were permitted to wear FDNY hats in solidarity with the fire department, although Muhammad and other Muslim women were not permitted to wear their khimars. Likewise, a brief observational survey conducted by the DOJ found over 300 violations of the headwear policy in just 11 hours in 2005. This lax enforcement weakens the Transit Authority's argument that its goal of maintaining a uniform workforce motivated its decision to transfer Muhammad to the bus depot. Accordingly, genuine questions of fact remain and the Transit Authority's motion for summary judgment on these grounds is denied.

### iii. *Disparate Impact*

The Transit Authority moves for summary judgment of Muhammad's disparate impact claims on the grounds that the claim is inadequately pleaded, that Muhammad cannot set out a *prima facie* case, and assuming she could, cannot present evidence showing that the Transit Authority's explanation for its conduct was pretextual. (Def.'s Br. at 20, 22-23.) The Transit Authority made this same argument in *Lewis*. The parties are directed to this Court's in-depth analysis denying the Transit Authority's motion for summary judgment on disparate impact claims. *Lewis*, 2014 WL 1343248, at *18.

In brief, disparate impact discrimination occurs when an employer uses facially neutral policies or practices that have a disproportionately adverse effect on protected groups. *Ricci*, 557 U.S. at 577-78. "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a *prima facie* violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci*, 557 U.S. at 578 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)).

Here, Muhammad makes out a *prima facie* case of disparate impact discrimination by showing that the Transit Authority's policy of transferring persons with religious objections to its uniform policy to the bus depot disproportionately affected members of plaintiff's protected class. The Transit Authority does not dispute that at least four Muslim women and a Sikh man were transferred out of passenger service for violating the headwear portion of the Transit Authority's uniform guidelines, while *zero* Transit Authority employees who violated the headwear policy for secular reasons were transferred, although there were at least 64 such violations between 2003 and 2005. (Schoolman Ex. 6, Bus Operator Out of Uniform 2003-2005

EIS Query.)  Thus, 100% of those with religious objections were transferred, while 0% of employees with secular objections were transferred.  Indeed, the Transit Authority's November 17, 2003 Permanent Bulletin contemplated just this result when it demanded that supervisors strictly enforce the headwear rules and instructed them to direct employees with religious objections – as opposed to secular objections – to the headwear policy to the Depot AGM.  (Pl.'s Ex. C-3.)  This evidence, "on its face[,] conspicuously demonstrates [the headwear policy's] grossly discriminatory impact."  *Dothard*, 433 U.S. at 331.  Accordingly, a reasonable juror could conclude that the Transit Authority's facially neutral policies or practices had a disproportionately adverse effect on Muslim women.

The Transit Authority contends that the "lack of probative statistics dooms plaintiff's disparate impact claim," because statistical evidence is required to establish a *prima facie* disparate impact claim.  However, as this Court explained in *Lewis*, while plaintiffs must show a statistically significant disparity in the treatment of two groups, they are not required to make that showing by statistical evidence.  *Lewis*, 2014 WL 1343248, at *18 (citing *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576 (2d Cir. 2003); *Ricci*, 557 U.S. at 559). Here, as in *Lewis*, "statistical analysis is unnecessary because a reasonable juror can conclude that any similarly situated employee who wears a khimar would be subject to the same 'impact' as was plaintiff and while employees outside of plaintiff's protected class were certainly subject to these same rules, plaintiff and similarly situated Muslim women were affected to a greater degree than were non-Muslims.'"  *Lewis*, 2014 WL 1343248, at *18 (quotation marks and alterations omitted, citing *James*, 2005 WL 6182322 at *5).

The Transit Authority also argues that there is no statistically significant disparity because its policy was applicable to 10,000 employees and only affected four Muslim women,

and "four people out of 10,000 bus operators" fails the requirement that "[a] disparate impact claim [have] substantial statistical support."  (Def.'s Br. at 21.)  The Transit Authority's argument fails because "[t]he basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy."  *Tsombanidis*, 352 F.3d at 575.  What percentage of its employees belong to plaintiff's protected class is not relevant to the inquiry.  Rather, as explained above, the relevant comparison is between members of plaintiff's protected group (100% of whom were transferred to the bus depot on account of the headwear policy) and others (0% of whom were transferred to the bus depot on account of the headwear policy).  That statistical disparity is significant.  That the Transit Authority only employed 4 women who wear khimars – and thus its policies only affected 4 women who wear khimars – is not a fact that is helpful to this Court's analysis of Muhammad's disparate impact claim.[5]  A *prima facie* case of disparate impact liability is "essentially, a threshold showing of a significant statistical disparity," *Ricci*, 557 U.S. at 587 (citing *Connecticut v. Teal*, 457 U.S. 440, 446 (1982)), and Muhammad has made that showing.

The Transit Authority contends that, if Muhammad has made out a *prima facie* disparate impact claim, it has rebutted the *prima facie* case because "[m]aintaining and enforcing the uniform policy for bus operators in passenger service serves many valid and important purposes" including maintaining customer comfort and safety and boosting employee morale.  (Def.'s Br. at 22-23); *Ricci*, 557 U.S. at 578 (employer must rebut the *prima facie* case "by demonstrating

---

[5] Indeed, if this fact demonstrates anything, it is that Muslim women are a minority of the Transit Authority's workforce, and thus this Court should be particularly mindful to the potential for discrimination against them.  *See United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) (suggesting that "prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.").

that the practice is 'job related for the position in question and consistent with business necessity.'").  A plaintiff can rebut the employer's proffered job-related explanation by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

In advocating that it is justified in transferring female Muslim bus drivers out of passenger service to maintain customer comfort and boost employee morale, the Transit Authority misses the point of Title VII's disparate impact protection.  Muhammad's challenge is not to the Transit Authority's broad requirement that bus operators wear a uniform.  She does not dispute that many legitimate business interests are served by requiring all bus operators to wear a uniform.  Rather, Muhammad challenges the narrow change in policy and/or policy enforcement wrought in 2002 requiring bus operators who wore any headwear to cover that headwear with a bus depot baseball cap, and, if they objected on religious grounds, to be transferred out of passenger service.  The Transit Authority provides no legitimate business necessity for suddenly transferring its khimar-wearing bus operators out of passenger service after they had been driving buses while wearing khimars for years without incident.

In any event, Plaintiff has adduced sufficient evidence to show that the Transit Authority "refuse[d] to adopt an available alternative" that would have had "less disparate impact and serve[d] the employer's legitimate needs."  *Ricci*, 557 U.S. at 578.  Prior to 2002, the Transit Authority permitted its khimar-wearing bus drivers to work in passenger service so long as they wore a standard-issue uniform with a matching khimar.  The Transit Authority has not demonstrated why that policy, which had no disparate impact on Muslim women and served the Transit Authority's legitimate business interest of maintaining a neat and easily identifiable

workforce, could not have been readopted.  The Transit Authority speculates that permitting minor variances in appearance could have been viewed as unfair and led to lower employee morale and productivity.  (Def.'s Br. at 23 n.73.)  However, the Transit Authority presents no evidence that morale was in any way diminished before it implemented this policy or that morale improved after all khimar-wearing bus operators were transferred out of passenger service. Accordingly, it is a genuine question of material fact whether the Transit Authority's headwear policy had a disparate impact on khimar-wearing bus operators.

## C.  First Amendment - Muhammad Sets out a Prima Facie Case of Religious Discrimination under the Free Exercise Clause of the First Amendment of the Constitution

Relying on the doctrine set out in *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990), the Transit Authority asserts that Muhammad cannot make out a First Amendment claim because its no-headscarf policy is a neutral rule of general applicability and thus analyzed under a rational basis framework.  (Def.'s Br. at 19.)[6]  The Transit Authority made this same argument in *Lewis*, and the parties are directed to this Court's decision in *Lewis* for a more in-depth analysis of this issue.  2014 WL 1343248 at *26.  In brief, the Transit Authority's argument fails as a factual matter because the policy at issue is not a neutral rule of general applicability.  Rather, it expressly provides that "[i]f the employee states that he/she is not permitted to wear anything over the non-[Transit Authority] issued headwear for religious

_____

[6] According to *Smith*, the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)."  494 U.S. at 879 (internal quotation marks omitted).  "Where the government seeks to enforce a law that is neutral and of general applicability, … it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices."  *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002); *Seabrook v. City of New York*, 210 F.3d 355 (2d Cir. 2000) (citing *Smith*, applying rational basis review to Free Exercise challenge to pants-only policy by Pentecostal corrections officers); *Kalsi v. New York City Transit Authority,* 62 F. Supp. 2d 745, 761 (E.D.N.Y. 1998) (citing *Smith*, applying rational basis review to Free Exercise challenge to hard-hat requirement by Sikh employee).

reasons, inform the employee that he/she must immediately visit the Depot AGM[] to discuss the matter." (Pl.'s Ex. C-3.)

As the Supreme Court set out in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." 508 U.S. 520, 532 (1993). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral and it is invalid *unless it is justified by a compelling interest and is narrowly tailored to advance that interest*." *Id*. at 533 (emphasis added, internal citation omitted). In such circumstances, the rational basis standard set out in *Smith* does not apply. "In determining if the object of a law is a neutral one under the Free Exercise Clause, [courts consider] … both direct and circumstantial evidence." *Lukumi Babalu Aye*, 508 U.S. at 540. The Court "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id*. at 534. However, "[f]acial neutrality is not determinative," and "[a]part because the text, the effect of a law in its real operation is strong evidence of its object." *Id*. at 535. Other relevant evidence includes "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id*. at 540.

Indeed, the Second Circuit has recently reaffirmed that the relevant question in determining which level of scrutiny applies to a regulation is an analysis of its "'operation,' as assessed in 'practice terms.'" *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't*

*of Health & Mental Hygiene*, 13-107-CV, 2014 WL 3973156, at *9-10 (2d Cir. Aug. 15, 2014)

(quoting *Lukumi Babalu Aye*, 508 U.S. at 535-36).  The Second Circuit concluded from the

surrounding facts and the effect of a regulation that, although neutrally framed to require parental

consent before any circumcision on a male infant can be performed involving "oral suction," the

regulation at issue was, "[a]s a practical matter," designed to "single[] out the religious practice

of metzitzah b'peh," a practice of some Orthodox Jews.  *Id*.  Accordingly, the Second Circuit

concluded that

> *Smith* is inapplicable here: the plaintiffs are not requesting an exemption from a
> law that is otherwise valid when applied to secular conduct. Instead, they
> challenge a law that purposely and exclusively applies only to them, as religious
> actors conducting a religious ritual. … [W]here such purposeful and exclusive
> regulation exists—where the object of the law is itself the regulation of religious
> conduct—the law is subject to heightened scrutiny, and not to rational basis
> review.

*Id*. at *10.

Here, contrary to the Transit Authority's contention, rational basis review under *Smith*

does not apply because Muhammad's Free Exercise claim is directed at the Transit Authority's

expressly non-neutral November 17, 2003 Bulletin and its policy and practice of targeting

Muslim women for transfer to the bus depot.  When Muhammad was transferred to the bus

depot, the policy was that employees with religious objections to its headgear requirements were

to be transferred to the bus depot.  The November 17, 2003 Bulletin expressly required Muslim

female bus drivers to cover their khimars with a "depot logo cap."  (Pl.'s Ex. C-3.)  Later policies

expressly required Muslim female bus drivers to affix a Transit Authority logo to their khimars,

including some that bore illustration of women wearing khimars with logos on their foreheads.

As this Court explained in *Lewis*, "in addition to the text of the policies, '[i]t becomes evident

that these [Bulletins] target [khimar wearers] when the [Bulletins]' operation is considered.'"

*Lewis*, 2014 WL 1343248 at *26 (quoting *Lukumi Babalu Aye*, 508 U.S. at 535) (alterations in *Lewis*). While Muhammad and other Muslim women were transferred out of passenger service, the DOJ observed over 300 secular violations of the Transit Authority's uniform policy in a mere 11 hours of observation. As a non-neutral policy, the Transit Authority's headwear policy is governed by the strict scrutiny standard set out in *Lukumi Babalu Aye*.

Applying strict scrutiny, this Court must balance Muhammad's First Amendment rights against the Transit Authority's compelling interest: presenting a uniform workforce, and ensure that the Transit Authority's policy was narrowly tailored to achieve that goal. *Lukumi Babalu Aye*, 508 U.S. at 533. The Transit Authority does not purport to explain how transferring Muhammad and other female Muslim bus drivers to the bus depot was narrowly tailored to achieve its goal of presenting a uniform workforce, particularly in light of the evidence of the lax enforcement of its uniform policies. Nor does the Transit Authority purport to explain how a subtle change to its policy permitting religious headwear that matches the standard-issued Transit Authority uniform would have hindered its ability to present transit riders with a uniform workforce. *Id.* at *26. Accordingly, Muhammad has adduced sufficient evidence to create a genuine question of material fact whether the Transit Authority's headwear policies violated Muhammad's right to Free Exercise, and the Transit Authority's motion for summary judgment on these grounds is denied.

## CONCLUSION

For the forgoing reasons, the Transit Authority's motion for summary judgment is denied

in its entirety. Plaintiff's claims of gender and race discrimination are dismissed as withdrawn.

**SO ORDERED.**

_____S/_____
SANDRA L. TOWNES
United States District Judge

Brooklyn, New York
Dated: September 30, 2014